Javier L. Merino
Marc E. Dann (pro hac vice anticipated)
Dann Law
372 Kinderkamack Road, Suite 5
Westwood, NJ 07675
Phone: (216) 373-0539
Fax: (216) 373-0536
notices@dannlaw.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
## WHITE PLAINS DIVISION

| | |
|---|---|
| **WILLIAM LIGUORI, JR.**, individually and on behalf of all those similarly situated, | Civil Action No.: |
| -and- | |
| **TRICIA LIGUORI**, individually and on behalf of all those similarly situated, | **CLASS ACTION COMPLAINT FOR DAMAGES** |
| -and- | |
| **JOSE AGUILAR**, individually and on behalf of all those similarly situated, | **JURY DEMAND ENDORSED HEREON** |
| -and- | |
| **ELIZABETH MANLEY**, individually and on behalf of all those similarly situated, | |
| Plaintiffs, | |
| vs. | |
| **WELLS FARGO BANK, N.A.**, c/o Corporation Service Company 50 West Broad Street, Suite 1330 Columbus, OH 43215 | |
| Defendant. | |

Plaintiffs William Liguori, Jr., and Tricia Liguori (the "Liguoris"), Jose Aguilar ("Aguilar"), and Elizabeth Manley ("Manley") (collectively, "Plaintiffs"), individually and on behalf of all those similarly situated, through counsel, state as follows for their complaint against Defendant Wells Fargo Bank, N.A. ("Wells Fargo"):

## PARTIES, JURISDICTION, AND VENUE

1.      The Liguoris were the owners of residential real property, located at and commonly known as 40 South Parliman Road, Lagrangeville, NY 12540 (the "Liguori Property") which they occupied as their primary, principal residence until it was transferred by a Referee's Deed on March 10, 2015.

2.      The Liguoris are each a natural person residing in Dutchess County, New York at their residence of 511 Chestnut Ridge Road, Dover Plains, NY 12522.

3.      Aguilar and Manley were the owners of residential real property, located at and commonly known as 203 Edwin Street, Chittenago, NY 13037 (the "Aguilar/Manley Property") which they occupied as their primary, principal residence until it was sold at Sheriff's sale on November 30, 2015.

4.      Aguilar is a natural person residing in Madison County, New York at his residence of 107 Laura Court, Chittenango, NY 13037.

5.      Manley is a natural person residing in Pinellas County, Florida at her residence of 744 Charlotte Ave, Tarpon Springs, FL 34689.

6.      Wells Fargo is a federally chartered National Banking Association that is organized and exists under the National Banking Act, with its principal place of business located in Sioux Falls, South Dakota. Wells Fargo is subject to the supervision of the Comptroller of the

Currency of the United States Department of the Treasury and is deemed a citizen of South Dakota pursuant to 28 U.S.C. § 1348.

7.     Wells Fargo executes contracts across the United States and in the State of New York, including the loans at issue with the Aguilar/Manley Property in Madison County, New York and the Liguori Property in Dutchess County, New York. Wells Fargo regularly engages and transacts substantial business across the State of New York.

8.     As to William Liguori, Jr.'s claims, this Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA) and the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* (RESPA).

9.     This Court has supplemental jurisdiction to hear all of William Liguori, Jr.'s state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

11.     This action is filed to enforce regulations promulgated by the Consumer Finance Protection Bureau (CFPB) and implemented pursuant to 12 U.S.C. § 2605(f) that became effective on January 10, 2014, specifically, 12 C.F.R. § 1024.1, *et seq.* ("Regulation X").

12.     In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

13.     Specifically, on January 17, 2013, the CFPB issued the Real Estate Settlement Procedures Act Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

## INTRODUCTION TO RESPA CLAIMS

14.     William Liguori, Jr.'s mortgage loan was a "federally related mortgage loan" as said term is defined by 12 C.F.R. § 1024.2(b).

15.     Wells Fargo is subject to the aforesaid regulations and does not qualify for the exemption for "small servicers", as defined in 12 C.F.R. § 1026.41(e)(4).

16.     Wells Fargo is not a "qualified lender", as defined in 12 C.F.R. § 617.700.

17.     William Liguori, Jr. asserts claims for relief against Wells Fargo for breaches of the specific rules under Regulation X, specifically 12 C.F.R. § 1024.41, as set forth, *infra*.

18.     William Liguori, Jr. has a private right of action under RESPA pursuant to 12 U.S.C. § 2605(f) for the claimed breaches and such action provides for remedies including actual damages, statutory damages, and attorneys' fees and costs.

## NATURE OF THE CASE

19.     Plaintiffs each suffered from Wells Fargo's uniform and automated "faulty calculation" errors, which caused Wells Fargo to wrongfully deny loan modifications to hundreds of consumers, many of whom lost their homes to foreclosure.

20.     Wells Fargo, as one of the largest lending and loan servicing institutions, services residential home mortgages. Wells Fargo also provides mortgage loan modification services to borrowers who have defaulted on their mortgage.

21.     Wells Fargo is a loan servicer and lender. It derives income in a number of ways including: Payments based on a percentage of each borrower's principal balance pool; float interest; late fees; foreclosure fees; property inspection and preservation fees; and broker opinion fees.

22.     Wells Fargo is a wholly owned and controlled subsidiary of Wells Fargo & Company ("WFC"), one of the nation's largest financial institutions. WFC is a Delaware corporation headquartered in San Francisco, California and a registered bank holding company.

23.     WFC describes itself as a "diversified, community-based financial services company with $1.87 trillion in assets." Wells Fargo & Company, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (Nov. 6, 2018). It provides "banking, investment, and mortgage products and services as well as consumer and commercial finance, through 8,050 locations, 13,000 ATMs, digital (online, mobile, and social), and contact centers (phone, email, and correspondence)." *Id.* WFC employs approximately 262,000 full-time employees in 37 countries and serves "one in three households in the United States." *Id.*

24.     Wells Fargo utilizes uniform and standardized loan servicing, loan modification, and foreclosure practices nationwide. Much of Wells Fargo's uniform and standardized loan servicing, loan modification, and foreclosure practices are reliant upon automated processes, systems, and tools.

25.     Wells Fargo uses proprietary mortgage loan modification tools to perform automated calculations and determine whether defaulted borrowers are eligible or qualified for

loan modifications under Government Sponsored Enterprise ("GSE") and federal agency requirements.

26.    Wells Fargo's loan servicing, loan modification, and foreclosure practices are governed by federal requirements and obligations.

27.    The Fair Housing Agency (FHA) is an agency within the United States Department of Housing and Urban Development (HUD) that supplies mortgage insurance to FHA-approved lenders, insuring loans on single-family homes.

28.    Mortgage insurance protects lenders from the risk of borrower defaults because the FHA agrees to pay lenders in the event of borrower default. Lenders must be pre-approved to qualify for FHA mortgage insurance and must also comply with HUD regulations.

29.    Wells Fargo is a pre-approved lender who qualifies for and at all times relevant did qualify for FHA mortgage insurance. Wells Fargo is therefore required to comply with HUD regulations. For loans that are protected by FHA mortgage insurance, Wells Fargo and the borrowers executed loan documents that incorporate by reference HUD regulations.

30.    In 2008, the federal government began the Troubled Asset Relief Program (TARP). Pursuant to TARP, all servicers that receive funding from TARP must participate in the FHA Home Affordable Modification Program (HAMP).

31.    Wells Fargo received about $25 billion in TARP funds. In return, Wells Fargo agreed to participate in HAMP and be obligated by all HAMP provisions, regulations, directives, guidelines, procedures, documentation, instructions, bulletins, frequently asked questions, letters, directives, and other communications issued by the Department of Treasury, GSEs, and federal agencies ("Program Documentation").

32.     In 2009, the Secretary of the Treasury implemented HAMP, which was designed to minimize foreclosures by incentivizing loan modifications. Pursuant to HAMP, HUD has promulgated HAMP guidelines, regulations, and directives.

33.     All servicers of any loan guaranteed or owned by a GSE or government agency must comply with all Program Documentation. Program Documentation obligations are voluntary for servicers of loans that are not guaranteed or owned by a GSE or government agency unless that servicer has executed a Service Participation Agreement. Stated otherwise, once a servicer elects to participate, all program standards become mandatory. HAMP incentivizes servicers to execute Service Participation Agreements.

34.     On April 13, 2009, Wells Fargo entered into a Servicer Participation Agreement with the federal government. The Servicer Participation Agreement incorporates all Program Documentation and requires Wells Fargo to comply with all Program Documentation with a high professional standard of care.

35.     In short, Wells Fargo is required to comply with all Program Documentation, HAMP, and other Department of Treasury directives. Among other things, Wells Fargo is required to review defaulted loans for modification eligibility prior to proceeding with any foreclosure. Wells Fargo is required to offer all defaulted borrowers modifications for which they are eligible prior to conducting any foreclosure. HAMP guidelines require Wells Fargo undertake a number of specific and non-discretionary steps to determine a consumer's eligibility for modification or other relief. If, after completing a formula-driven net present value analysis, the modified loan would be more profitable than the non modified loan, HAMP guidelines

require Wells Fargo offer a trial period plan modification. If the borrower completes the trial period plan, Wells Fargo is required to permanently modify the loan.

36.     To request a modification, the Program Documentation requires each borrower submit standardized form assistance applications, financial worksheets, hardship affidavits, and acknowledgment and agreements (the "Modification Contract"). Pursuant to the standard form Modification Contract, the borrower makes a legal representation as to the material truth of all information provided. The borrower agrees to provide all requested financial and hardship information. Among other things, the borrower also promises to undergo credit counseling if they are requested. In return, Wells Fargo agrees in the Modification Contract to examine the borrower's eligibility for all available modifications. If the borrower is eligible for any available mandatory modifications, Wells Fargo is required by the Modification Contract (as well as HAMP and other Department of Treasury directives) to extend a trial period plan.

37.     These standardized Modification Contracts incorporate all applicable obligations in the Program Documentation.

38.     In all relevant communications with borrowers, Wells Fargo represents that it will extend trial period plans to any borrower who is eligible for a mandatory modification under GSE guidelines and HAMP.

39.     Wells Fargo receives incentive payments for every successful modification under the Program Documentation. However, Wells Fargo also benefits from unsuccessful modifications, along with foreclosures. If a federally mandated modification is not required, Wells Fargo can offer modification and temporary payment plans outside of HAMP, often under terms that are less favorable to the borrower than federally-mandated plans. Further, Wells Fargo

can continue to obtain fees from foreclosure activities, late payments, property inspections, property preservation, and broker's price opinions. Wells Fargo also receives higher float interest payments for non-modification options such as a short sale or a foreclosure. It further receives higher principal balance pool payments if it does not reduce the principal balance pursuant to Program Documentation requirements.

40.     Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its automated decision-making tool. This software determined borrowers' eligibility for government-mandated mortgage modifications during a time of extreme financial distress. Its importance to these borrowers' lives cannot be overstated. Yet, Wells Fargo not only failed to verify that its software was correctly calculating whether borrowers met threshold requirements for a mortgage modification, it failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors impacting Plaintiffs to remain uncorrected for years on end.

41.     Wells Fargo was not required to develop its own tool to calculate whether borrowers were eligible for government-mandated mortgage modifications. The government provided a free software tool for mortgage servicers to use in determining whether borrowers met threshold requirements. If Wells Fargo was not going to properly verify and audit its own software, it could have—and should have—used the free software instead.

42.     As a result of Wells Fargo's deficient auditing and compliance procedures, Wells Fargo repeatedly violated HAMP and other government requirements over a period of at least eight years and denied Plaintiffs for trial modifications that Wells Fargo was legally required to offer.

43.     Wells Fargo failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of the Comptroller of the Currency (OCC) found numerous deficiencies in Wells Fargo's mortgage modification and foreclosure practices.

44.     The OCC found, among other things, that Wells Fargo had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

45.     Wells Fargo agreed to correct these deficiencies in two 2011 consent orders. Wells Fargo pledged in the consent orders to maintain adequate governance and controls to ensure compliance with HAMP, to engage in ongoing testing for compliance with HAMP, and to ensure that its mortgage modification and foreclosure practices were regularly reviewed with any deficiencies promptly detected and remedied. Wells Fargo also promised to maintain a compliance committee of board members to monitor its ongoing compliance with the consent orders.

46.     In one of the consent orders, the Federal Reserve ordered Wells Fargo to take steps to ensure that it complies with its obligations under the consent orders, including, strengthening oversight of compliance with HAMP and other government requirements, ensuring that audit and compliance programs were adequately staffed, and improving compliance information and reports.

47.     Wells Fargo was supposed to make sure that it conducted the necessary testing to detect and remedy any violations of HAMP and other government requirements. Wells Fargo repeatedly failed to fulfill these obligations over the course of several years—in violation of the

promises it made in the 2011 consent orders and in callous disregard of the well-being of borrowers.

48.     Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June 2015, the OCC found that Wells Fargo was still in continuing noncompliance. Among other things, the OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and other government requirements, not ensured that its audit and compliance programs had the requisite authority and status so that deficiencies in mortgage modification and foreclosure practices would be identified and promptly remedied, and not ensured that it was making reasonable good faith efforts, consistent with HAMP and other government requirements, to modify delinquent mortgage loans and prevent foreclosures of borrowers' homes.

49.     In response to Wells Fargo's ongoing violations of the 2011 consent orders, the OCC prohibited Wells Fargo, and its parent company, Wells Fargo & Company ("WFC"), from growing its residential mortgage servicing business until it brought its operations into compliance with an amended consent order. The OCC also stated that it would be taking additional action against Wells Fargo, the nature and severity of which would depend on the nature, length, and severity of Wells Fargo's continued noncompliance with the amended consent order.

50.     As a result of Wells Fargo's continuing failure to implement adequate auditing and compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software that led it to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014. The OCC specifically noted this error in its May 24, 2016 order

requiring WFC to pay a civil money penalty of $70 million. WFC accepted the $70 million penalty and acknowledged the error that led Wells Fargo to wrongly deny mortgage modifications to 184 customers in 2013-2014.

51.     Indeed, unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage modification software in August 2013—which caused Wells Fargo to wrongly deny mortgage modifications to an additional 625 customers. Wells Fargo and WFC decided not to disclose that Wells Fargo had discovered this error—likely as part of an effort to avoid a larger penalty from the OCC, ensure that the OCC would terminate its supervision under the 2011 consent orders and lift the business restrictions it had imposed in 2015, and to avoid civil liability to those wronged homeowners.

52.     To make matters worse, even after discovering the 2013 error, Wells Fargo continued using the faulty mortgage modification software to assess borrowers' eligibility for modification options for more than two years. Wells Fargo did not implement new controls until October of 2015 and it did not disclose the error to federal regulators or the public until August of 2018.

53.     Moreover, despite discovering the error in 2013 and eventually implementing new controls in 2015, Wells Fargo still did not reform its auditing and verification practices. Related errors that would affect an additional 245 customers were not discovered, remedied, or disclosed until 2018.

54.     Wells Fargo's failure to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that

Wells Fargo and WFC intentionally abandoned their oversight responsibilities—and did so to a shocking degree. And until they were caught red handed, they concealed those failures.

55.     Wells Fargo repeatedly promised to reform its central oversight as part of its settlements with the government. Each time, it failed to live up to those promises and continued to abdicate its oversight responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law.[1]

56.     Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced that it would prohibit its WFC from expanding its business until it sufficiently improves its governance and controls.

57.     In its cease and desist order, the Federal Reserve Board found that Wells Fargo and WFC had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

58.     WFC was ordered to submit a plan for reforming oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary to oversee Wells Fargo's execution of its compliance control program.

---

[1] *See In re: Wells Fargo Bank, N.A.*, O.C.C. Consent Order #2018-025 at p. 2, https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf (April 20th, 2018).

59.     WFC was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

60.     Until these plans for reform are approved by the Federal Reserve Board and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo and WFC are subject to an asset cap that restricts the company from growing larger. As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."[2]

61.     A few months after the Federal Reserve's 2018 cease and desist order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2013 error—first to its shareholders in WFC's Q2 2018 Form 10-Q and then to the borrowers who were denied mortgage modifications, many of whom lost their homes as a result of the error. WFC wrote in its 10-Q that approximately 625 customers were incorrectly denied a loan modification between April 12, 2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances resulted in a foreclosure. WFC also wrote that it had "accrued $8 million to remediate customers," which amounts to an average of only $12,800 per customer.

62.     Three months later, in its next Form 10-Q, WFC disclosed that Wells Fargo had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and April 30, 2018, when Wells

---

[2] "Federal Reserve Shackles Wells Fargo After Fraud Scandal", New York Times February 2, 2018 (Emily Flitter, Binyamin Appelbaum and Stacy Crowley), https://www.nytimes.com/2018/02/02/business/wells-fargo-federal-reserve.html

Fargo's claims "new controls were implemented." These related errors raised the number of affected customers to approximately 870 and the resulting wrongful foreclosures to approximately 545.

63.     Wells Fargo's long-overdue review of its automated mortgage modification software is apparently still not complete. In its recently filed 10-K Annual Report, WFC disclosed to shareholders that the "effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

64.     To compound matters during his testimony on March 12, 2019 in the United States House of Representatives Financial Services Committee, then CEO Timothy Sloan had the following exchange with Rep. Joyce Beatty:

> In your 10-Q filing from August 2018, your company stated that "an internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015 when the error was corrected. Additionally the filing stated, "as a result of this error, approximately 625 customers were incorrectly denied a loan modification . . . in approximately 400 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered loan modification, a foreclosure was complete." Wells Fargo later updated those numbers to 870 customers who were incorrectly denied a loan and your company had improperly foreclosed on 545 of these customers.
>
> What explains the gap between identifying the error in October 2015 and disclosing the error nearly 3 years later in August of 2018?
>
> **Response of Timothy Sloan:** Wells Fargo did not disclose the calculation error in the Home Preservation Application ("HPA") tool in October 2015 because a review of a sample of accounts at that time showed the error had not harmed customers. In 2018, while reviewing an unrelated issue, Wells Fargo re-reviewed the

> HPA tool error and determined that, in fact, it had impacted loan modification decisions between April 2010 and October 2015. Wells Fargo then disclosed this information in its second quarter 10-Q filing in August 2018.

65.     As a result of the OCC's continued investigations and resulting consent orders, Wells Fargo was and is on notice of serious errors, deficiencies, and unsafe and unsound practices in its loan servicing, modification, and foreclosure processes and practices from 2010 through the present. Wells Fargo was and is likewise aware of the need for oversight, testing and auditing of those processes and practices, including the need for oversight, testing, and auditing of automated tools. Yet Wells Fargo has habitually failed to adopt adequate oversight, testing, and auditing.

66.     Wells Fargo's deficiencies, unsafe and unsound practices, and failure to conduct adequate oversight, auditing, and testing, resulted in a number of systemic automated calculation errors that greatly affected borrowers.

67.     From 2010 through 2019, Wells Fargo utilized automated mortgage loan modification underwriting tools to determine what default borrowers are qualified for a mortgage loan modification or repayment plan.

68.     On information and belief, Wells Fargo repeatedly failed to test and audit its automated mortgage loan modification underwriting tool, despite the OCC investigations and consent decrees putting it on notice of significant issues with its mortgage practices. Wells Fargo likewise failed to adequately verify that its automated mortgage loan modification tools and standard foreclosure practices complied with consent decree requirements, regulations, and laws.

69.     As a result, Wells Fargo's automated mortgage loan modification tool has been plagued with errors. Due to errors in the tool, Wells Fargo wrongfully failed to approve hundreds

of borrowers for loss mitigation options including loan modifications and repayment plans. Most of those borrowers, including Plaintiffs and the potential Class Members, lost their homes.

## FACTUAL BACKGROUND

70.    On or around September of 2018, Wells Fargo sent form letters to certain consumers affected by its "calculation error." In those letters, Wells Fargo informed each consumer that, "[W]hen you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation and we're sorry. If it had been correct, you would have been approved for a trial modification." ***See Exhibit 1*** ("Apology Letter to Aguilar"); ***Exhibit 2*** ("Apology Letter to the Liguoris").

71.    Although Wells Fargo's apology letters state that it "now realize[s]" it has made an error causing it to wrongfully fail to approve the consumer's modification, Wells Fargo's August Report demonstrates that it has known about the error since at least August 2013.

72.    In Wells Fargo's apology letters, Wells Fargo encloses a payment "to help make up for [the borrower's] financial loss." *See Exhibits 1 and 2*. The enclosed payment is an arbitrarily chosen modicum of the damages suffered by the borrower as a result of modification denial and resulting foreclosure. Neither the payment nor the apology letter is accompanied by a release. *See Exhibits 1 and 2*. Indeed, through the apology letters, Wells Fargo encourages the borrower to cash the enclosed payment, and offers to attend additional mediation with the borrower (regardless of whether the borrower cashes the check) if the borrower does not believe that Wells Fargo has "made things right."

73.    Wells Fargo's apology letters also enclose a "Mediation Request Form" which states that the enclosed payment is available even if the borrower chooses to mediate. *See*

*Exhibits 1 and 2*. The Mediation Request Form also states that the borrower is "not waiving any legal claims by participating in the process." *See Exhibits 1 and 2*.

74.     Through Wells Fargo's apology letters, Wells Fargo also states that it is "also reaching out to the consumer reporting agencies to ask them to remove any negative reporting." *See Exhibits 1 and 2*.

75.     In short, Wells Fargo's apology letters admit that its accounting error caused borrowers harm, caused borrowers to be wrongfully denied a loan modification, and resulted in inaccurate negative reporting to consumer reporting agencies that should be corrected. Wells Fargo admits that it had done nothing prior to September 2018 to remediate borrowers and remove negative and inaccurate credit reporting.

76.     Despite knowing that its automated errors harmed borrowers (and admitting in its apology letters that it was appropriate to request consumer reporting agencies remove any negative reporting), Wells Fargo made no effort before November 2018 to rescind the inaccurate and negative information reported to credit reporting agencies regarding consumers affected by the automated errors.

## JOSE AGUILAR AND ELIZABETH MANLEY'S FACTUAL ALLEGATIONS

77.     On December 30, 2005, Aguilar and Manley purchased the Aguilar/Manley Property. Aguilar and Manley executed a note and executed a mortgage on the Aguilar/Manley Property that secures said note. From August 29, 2011 to September 22, 2014, Wells Fargo was the servicer of Aguilar and Manley's mortgage loan.

78.     In 2011, Aguilar and Manley fell upon hard times. In or about May 2011, Aguilar and Manley missed their first mortgage payment, defaulting on their loan pursuant to the

provisions in their standard-form mortgage. Wells Fargo reported Aguilar and Manley's default to credit reporting agencies.

79.     On August 17, 2012, Wells Fargo filed foreclosure in the Supreme Court of the State of New York, County of Madison, Index No. 1656/2012 (the "Aguilar/Manley Foreclosure").

80.     Aguilar and Manley sought mortgage assistance from Wells Fargo throughout his default. In 2013, they requested mortgage assistance. In or about September 2013, as a result of Wells Fargo's automated calculation errors, Wells Fargo erroneously determined that Aguilar and Manley were not qualified for a mortgage loan modification or temporary payment plan pursuant to the requirements of government-sponsored enterprises, the FHA, or HAMP. In or about September 2013, Wells Fargo wrongfully denied Aguilar and Manley's mortgage assistance due to applying the incorrect eligibility requirements to the loan.

81.     Aguilar and Manley complied with all obligations imposed by Wells Fargo. Indeed, Wells Fargo admits that, but for its accounting error, their modification request would have been granted.

82.     As Wells Fargo never modified Aguilar and Manley's loan, it moved forward with the Aguilar/Manley Foreclosure. On July 30, 2015, the foreclosure court granted an Order of Judgment of Foreclosure and Sale. On November 30, 2015, the Aguilar/Manley Property was sold at a Sheriff's sale.

83.     Since Aguilar and Manley lost their home because of Wells Fargo's calculation errors, Wells Fargo's actions directly and proximately caused Aguilar and Manley's damages. If Wells Fargo would have offered a HAMP TPP to Aguilar and Manley, they would have accepted

the offer because they intended to remain in their home. Aguilar and Manley intended to timely and properly make every TPP payment and every permanent modification payment.

84.     As a result of Wells Fargo's failure to modify Aguilar and Manley's loan and the loss of their home, Aguilar and Manley were forced to pay moving expenses and rent payments and suffered significant mental anguish which affected their personal and professional relationships, including dissolution of their marriage.

85.     More than eight years later, Wells Fargo sent Aguilar and Manley a form apology letter dated September 18, 2018. *See Exhibit 1*. The form apology letter inaccurately states that Wells Fargo has just now realized that it committed an error and that Aguilar and Manley should have been approved for a trial modification. *See Exhibit 1*. The apology letter acknowledges that Wells Fargo's error affected Aguilar and Manley at a time when they were facing a hardship and admits that Wells Fargo is obligated to "make things right." *See Exhibit 1*.

86.     This was the first time Aguilar and Manley learned that Wells Fargo had committed an accounting error and that their modification request should have been approved. Never in the years since their foreclosure did Wells Fargo attempt to discuss with Aguilar and Manley its accounting error or its wrongful failure to provide mortgage assistance.

87.     Along with the apology letter, Wells Fargo enclosed a check for an amount that Aguilar and Manley do not believe is anywhere close to enough to compensate them for the harm they suffered as a result of Wells Fargo's wrongful practices.

88.     Wells Fargo's repeated refusal to provide mortgage assistance (to which Aguilar and Manley were entitled), Wells Fargo's refusal to correct its error after identifying its automated calculation errors, along with the loss of their home caused Aguilar and Manley

significant stress and anxiety. Aguilar and Manley's personal relationships and credit suffered as a result of Wells Fargo's refusal to modify their loan, Wells Fargo's reports to consumer reporting agencies, and the ultimate foreclosure. Aguilar and Manley suffered opportunity costs and lost their home, as well as the equity, appreciation, and associated tax benefits. Aguilar and Manley wrongfully lost the opportunity to receive HAMP incentive payments and other methods of curing their default (including refinancing options) were affected by negative credit reporting. Aguilar and Manley also suffered moving and housing costs. The exact monetary value of damages suffered by Aguilar and Manley as a result of Wells Fargo's wrongful practices is unknown at this time.

### WILLIAM LIGUORI, JR. AND TRICIA LIGUORI'S FACTUAL ALLEGATIONS

89.     On or about October 18, 2006, the Liguoris purchased the Liguori Property. The Liguoris executed a note and executed a mortgage on the Liguori Property that secures said note. From October 18, 2006 to March 10, 2015, Wells Fargo was the servicer of the Liguoris' mortgage loan.

90.     On or around 2013, the Liguoris fell upon hard times. In or about 2013, the Liguoris missed their first mortgage payment, defaulting on their loan pursuant to the provisions in their standard-form mortgage. Wells Fargo reported the Liguoris' default to credit reporting agencies

91.     Through correspondence dated July 19, 2013, Wells Fargo invited the Liguoris to apply for mortgage assistance. A copy of the correspondence is attached as ***Exhibit 3***.

92.     Accordingly, the Liguoris sought mortgage assistance from Wells Fargo, and they thereafter requested mortgage assistance. Through correspondence dated March 25, 2014, Wells

Fargo acknowledged receipt of the Liguoris' request for mortgage assistance, and through correspondence dated April 7, 2014, Wells Fargo confirmed they received the documents necessary to determine the Liguoris' eligibility for mortgage loan assistance. A copy of the correspondence is attached as ***Composite Exhibit 4***.

93.     Through correspondence dated April 14, 2014, as a result of Wells Fargo's automated calculation errors, Wells Fargo erroneously determined that the Liguoris were not qualified for a mortgage loan modification or temporary payment plan pursuant to the Wells Fargo Standard Modification. Wells Fargo wrongfully denied Aguilar and Manley's mortgage assistance due to applying the incorrect eligibility requirements to the loan. A copy of the denial letter is attached as ***Exhibit 5***.

94.     On April 9, 2014, Wells Fargo filed a foreclosure action in the Supreme Court of the State of New York, County of Dutchess, Index No. 0000998/2014 (the "Liguori Foreclosure").

95.     As Wells Fargo never modified the Liguoris' loan, it moved forward with the Liguori Foreclosure. On November 6, 2014, the Dutchess County Supreme Court entered judgment of foreclosure in the Liguori Foreclosure. On March 10, 2015, the referee appointed by the Dutchess County Supreme Court transferred the Liguori Property to a buyer for $139,063.00.

96.     Since the Liguoris lost their home because of Wells Fargo's calculation errors, Wells Fargo's actions directly and proximately caused the Liguori's damages. If Wells Fargo would have offered a HAMP TPP to the Liguoris, they would have accepted the offer because they intended to remain in their home. The Liguoris intended to timely and properly make every TPP payment and every permanent modification payment.

97.     As a result of Wells Fargo's failure to modify the Liguoris' loan and the loss of their home, the Liguoris were forced to pay moving expenses and rent payments and suffered significant mental anguish which affected their personal and professional relationships.

98.     More than eight years later, Wells Fargo sent the Liguoris a form apology letter dated September 18, 2018. *See Exhibit 2*. The form apology letter inaccurately states that Wells Fargo has just now realized that it committed an error and that the Liguoris should have been approved for a trial modification. *See Exhibit 2*. The apology letter acknowledges that Wells Fargo's error affected the Liguoris at a time when they were facing a hardship and admits that Wells Fargo is obligated to "make things right." *See Exhibit 2*.

99.     This was the first time the Liguoris learned that Wells Fargo had committed an accounting error and that their modification request should have been approved. Never in the years since their foreclosure did Wells Fargo attempt to discuss with the Liguoris its accounting error or its wrongful failure to provide mortgage assistance.

100.     Along with the apology letter, Wells Fargo enclosed a check for an amount that the Liguoris do not believe is anywhere close to being enough to compensate them for the harm they suffered as a result of Wells Fargo's wrongful practices.

101.     Wells Fargo's repeated refusal to provide mortgage assistance (to which the Liguoris were entitled), Wells Fargo's refusal to correct its error after identifying its automated calculation errors, along with the loss of their home caused the Liguoris significant stress and anxiety. The Liguoris' personal relationships and credit suffered as a result of Wells Fargo's refusal to modify their loan, Wells Fargo's reports to consumer reporting agencies, and the ultimate foreclosure. The Liguoris suffered opportunity costs and lost their home, as well as the

equity, appreciation, and associated tax benefits. The Liguoris wrongfully lost the opportunity to receive HAMP incentive payments and other methods of curing their default (including refinancing options) were affected by negative credit reporting. The Liguoris also suffered moving and housing costs. The exact monetary value of damages suffered by the Liguoris as a result of Wells Fargo's wrongful practices is unknown at this time.

## **TOLLING ALLEGATIONS FOR ALL COUNTS**

102.    The causes of action alleged herein by Plaintiffs against Wells Fargo did not accrue or were tolled until Plaintiffs discovered, or could have discovered with the exercise of reasonable diligence, the facts giving rise to their legal claims. Based upon the allegations contained herein and the apology letters, the earlier any plaintiff could have learned of potential claims was September 18, 2018. *See Exhibits 1 and 2.*

103.    Based on all of the foregoing, Plaintiffs had no realistic possibility, until receiving the apology letters, to know that:

a.      They qualified for a loan modification; and

b.      They were denied wrongfully for a mortgage modification based on a miscalculation done by Wells Fargo's automated decision-making tool that was exclusively under the control of Wells Fargo at all times (as it remains).

104.    Based on all of the foregoing, Plaintiffs had no realistic ability to discover any facts only known to Wells Fargo regarding the wrongful denial for the mortgage modifications submitted between 2010 and 2015. Wells Fargo's automated decision-making tool is not public, and the mathematical calculations used to determine eligibility for any mortgage modification

depend solely on variables within Wells Fargo's exclusive control or information provided exclusively to Wells Fargo.

105.    Based on the foregoing, any applicable statutes of limitations were tolled by Wells Fargo's knowing, active, and ongoing concealment of the facts alleged herein. Wells Fargo discovered at least one, if not multiple, software errors back in August 2013 which contributed to the wrongful denial of loans modifications of Plaintiffs.

106.    Based on all of the foregoing and each 10-Q issued by WFC since August 2018, Wells Fargo deliberately concealed any information regarding the wrongful denial until September 18, 2018. Wells Fargo has a continuous duty to disclose the truth to Plaintiffs and based upon the actions herein, Plaintiffs reasonably relied on Wells Fargo's ongoing concealment until taking the actions to procure discovery described herein.

<u>PROPRIETY OF CLASS ACTION PROSECUTION</u>

A.    **Proposed Class Definition**

107.    The members of the Proposed Class (the "New York Class" or "Class") include all individuals:

      a.    who were a mortgagee to any New York residential home mortgage loan owned and/or serviced by Wells Fargo on or after March 15, 2010,

      b.    which loan entered loss mitigation review and/or was the subject of any borrower or mortgage assistance application submitted on or after March 15, 2010 through April 30, 2018,

      c.    which loan qualified for a mortgage loan modification, repayment plan, or a trial period plan pursuant to the requirements of government-sponsored

entities, non-government sponsored entities, the FHA, and/or the HAMP

programs,

d.     but which loss mitigation review and/or borrower or mortgage assistance

application was denied by Wells Fargo,

e.     as a result of automated calculation and related errors pertaining to Wells

Fargo's use of a mortgage loan modification underwriting tool

**B.     Fed. R. Civ. P. 23(a)(1): Numerosity**

108.    Based upon Wells Fargo's discovery produced in *Hernandez v. Wells Fargo*

*Bank, N.A.*, United States District Court Case No. 3:18-cv-07354-WHA, the New York Class is

comprised of approximately 69 Class Members. ***See Exhibit 6*** – Wells Fargo's Supplementary

Responses to Plaintiff's First Set of Interrogatories dated August 22, 2019. Thus, the Class is so

numerous that joinder of all members in impracticable. Class members can easily be identified

through Wells Fargo's records, or by other means.

**C.     Fed. R. Civ. P. 23(a)(2) and (b)(3): Commonality and Predominance.**

109.    There are common questions of law and fact subject to answers common to all

Proposed Class members that predominate over any questions affecting only individual

members, including but not limited to:

a.     What calculation and related errors occurred in Wells Fargo's mortgage

loan modification underwriting tool and/or related software between 2010

and 2018?

b.     What were Wells Fargo's common policies and practices regarding its

oversight, inspection, auditing, testing, review, repair, and control of

automated loan modification tools and related software between 2010 and 2018?

c.      What were Wells Fargo's common policies and practices regarding the inspection, verification, and reporting of negative information to credit reporting agencies between 2010 and 2018?

d.      What were Wells Fargo's common policies and practices regarding rescinding or correcting negative information that was erroneously reported to credit reporting agencies between 2010 and 2018?

e.      How and when did Wells Fargo discover errors in its automated loan modification tools and related software?

f.      What actions and/or disclosures did Wells Fargo take and/or make each time it discovered errors in its automated loan modification tools and related software?

g.      When was Wells Fargo on notice of the risk of errors in its automated loan modification tools due to inadequate oversight, auditing, and testing compliance mechanisms?

h.      Did Wells Fargo undertake any effort to correct its erroneous reporting to credit reporting agencies prior to September 2018?

i.      Did Wells Fargo owe contractual obligations to Proposed Class members by failing to approve them for loan modifications or repayment plans for which they were qualified pursuant to pursuant to the requirements of government sponsored enterprises, the FHA, and HAMP?

j.      Did Wells Fargo breach those contractual obligations?

k.      Was Wells Fargo's conduct extreme and outrageous?

l.      Did Wells Fargo intentionally, with substantial certainty, or with reckless indifference cause serious emotional harm to members of the Proposed Class?

m.      Did Wells Fargo conceal or misrepresent to members of the Proposed Class its automated calculation errors and/or their entitlement to loan modifications?

n.      Was any such concealment or misrepresentation material to members of the Proposed Class' loan modification?

o.      Did Wells Fargo conceal or misrepresent material facts with knowledge of the fact's materiality and falsity and/or with such utter disregard and recklessness as to infer knowledge of its falsity?

p.      Did Wells Fargo conceal or misrepresent material facts with the intent of provoking justified reliance from members of the Proposed Class?

**D.    Fed. R. Civ. P. 23(a)(3): Typicality.**

110.    The claims of the Plaintiffs are typical of the claims of the class:

a.      Plaintiffs were subject to a mortgage of a residential home mortgage loan that was owned and/or serviced by Wells Fargo on or after March 15, 2010.

b.      Plaintiffs submitted mortgage assistance applications and their loan entered loss mitigation review on or after March 15, 2010.

      c.      Plaintiffs qualified for mortgage loan modification trial period plans pursuant to HAMP.

      d.      But Plaintiffs' requests for modification and the loss mitigation review were denied by Wells Fargo.

      e.      And that denial was a result of automated calculation and related errors pertaining to Wells Fargo's use of mortgage loan modification and underwriting tool. Had Wells Fargo not based its decision on a faulty calculation, Plaintiffs would have been approved for trial modifications.

      f.      As such, Plaintiffs are members of the Proposed Class.

111.    Wells Fargo's actions and inactions described above violated Plaintiffs' and the Proposed Class' statutory and common law rights.

112.    Plaintiffs and all members of the Proposed Class have suffered damages as a result of Wells Fargo's actions and inactions described above.

113.    Furthermore, Wells Fargo's defenses to Plaintiffs' claims and the claims of members of the Proposed Class will be largely identical for a number of reasons, including:

      a.      Wells Fargo's failure to approve Plaintiffs and the Proposed Class for temporary trial modification plans were the result of the same accounting and related errors, affecting the same calculation of attorneys' fees, effectuated using the same mortgage loan modification underwriting tool;

      b.      Wells Fargo admits that, had it not based its modification decision regarding Plaintiffs and members of the Proposed Class on a "faulty

calculation" Plaintiffs and all members of the Proposed Class would have received trial modifications;

c.    Wells Fargo utilized common and uniform policies, forms, and procedures when considering Plaintiffs' and all Proposed Class members' loans for modification; and,

d.    Plaintiffs' claims are predicated on duties and actions identical to Wells Fargo's duties and actions owed and taken in regard to all Proposed Class members' residential real property loans.

**E.    Fed. R. Civ. P. 23(a)(4): Adequacy of Representation**

114.    Plaintiffs will fairly and adequately protect the interests of the class.

115.    Plaintiffs come before this Court as victims of Wells Fargo. They were the mortgagees of loans that were in default and serviced by Wells Fargo. They were qualified for mortgage loan modification or repayment plans. But due to Wells Fargo's calculation and other automated errors, they were wrongfully denied modification. Ultimately, Plaintiffs each lost their homes in foreclosure.

116.    Plaintiffs come in the same capacity as any other litigant seeking redress for grievances and class relief for the harm which they and members of the Proposed Class suffered.

117.    Plaintiffs have no interest that is antagonistic to those of the Proposed Class and are ready and willing to bring this class action in a representative capacity on behalf of the Proposed Class.

118.    Plaintiffs counsel will fairly and adequately prosecute the case on behalf of Plaintiffs and the Proposed Class.

119.    The Dann Law Firm has experienced trial attorneys who have engaged in extensive trial practice and have considerable experience in all aspects of class and mass tort litigation from several other class action and mass tort cases, including class action and mass tort cases against lenders and loan servicers.

120.    The Dann Law Firm has the necessary skills, expertise, and competency to adequately represent Plaintiffs' interests and those of the class.

### COUNT ONE
### VIOLATIONS OF 12 C.F.R. § 1024.41(c)

**(On behalf of William Liguori, Jr.)**

121.    William Liguori, Jr. restates and incorporates all of his statements and allegations contained in paragraphs 1 through 76 and 102 through 106, in their entirety, as if fully rewritten herein.

122.    12 C.F.R. § 1024.41(a) explicitly provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. § 2605(f))."

123.    12 C.F.R. § 1024.41(b)(1) defines a "complete loss mitigation application" as "an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower."

124.    12 C.F.R. § 1024.41(c)(2)(iv) defines a "facially complete application" as an application with which "a borrower submits all the missing documents and information as stated in the notice required under paragraph (b)(2)(i)(B) of this section, when no additional information is requested in such notice, or once the servicer is required to provide the borrower a written notice pursuant to paragraph (c)(3)(i) of this section."

125.   12 C.F.R. § 1024.41(c)(1) provides:

[I]f a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving a borrower's complete loss mitigation application, a servicer shall:

(i) Evaluate the borrower for all loss mitigation options available to the borrower; and

(ii) Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage.

126.   Comment 1 of the Official Interpretations of the CFPB to 12 C.F.R. § 1024.41(b)(3) provides that if no foreclosure sale is scheduled as of the date a loss mitigation application is received, the application is considered to have been received more than ninety (90) days before any foreclosure sale.

127.   According to Wells Fargo's April 7, 2014 letter, Wells Fargo did not request additional or corrective information or documents and therefore Wells Fargo received all the information that it required to review William Liguori, Jr.'s eligibility for mortgage payment assistance options - making his application a complete loss mitigation application pursuant to 12 C.F.R. § 1024.41(b)(1) or at the very least a facially complete application pursuant to 12 C.F.R. § 1024.41(c)(2)(iv). *See Exhibit 4.*

128.   William Liguori, Jr.'s mortgage loan was not scheduled for a foreclosure sale at the time his application was considered complete by Wells Fargo because Wells Fargo did not file the Liguori Foreclosure until after William Liguori, Jr. submitted his loss mitigation application. *See Exhibit 4.*

129.    Wells Fargo, through the April 7, 2014 letter, deemed William Liguori, Jr.'s loss mitigation application to be complete. *See Exhibit 4.*

130.    On or before April 7, 2014, Wells Fargo was in possession of a complete loss mitigation application and therefore was obligated to notify William Liguori, Jr. of its determination of which loss mitigation options, if any, it would offer to him in accordance with the requirements of 12 C.F.R. § 1024.41(c)(1).

131.    As evidenced by the April 14, 2014 letter, Wells Fargo claimed that William Liguori, Jr. was not eligible for a HAMP modification. *See Exhibit 5.*

132.    However, according to Apology Letter to the Liguoris, not only was William Liguori, Jr. eligible for a HAMP modification, he would have qualified for a HAMP trial plan offer. *See Exhibit 2.*

133.    Wells Fargo's failure to review William Liguori, Jr. for all loss mitigation options available to him, including HAMP, constitutes a clear, separate, and distinct violation of 12 C.F.R. § 1024.41(c).

134.    Wells Fargo's actions directly, foreseeably, and proximately caused William Liguori, Jr.'s damages, as discussed, *supra*, at ¶ 101.

135.    Wells Fargo's actions are part of a pattern and practice of behavior in conscious disregard for William Liguori, Jr.'s rights.

136.    As a result of Wells Fargo's actions, Wells Fago is liable to William Liguori, Jr. for actual damages and statutory damages, 12 U.S.C. § 2605(f)(1).

137.    Additionally, William Liguori, Jr. requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

## COUNT TWO
## VIOLATIONS OF 12 C.F.R. § 1024.41(f)

**(On behalf of William Liguori, Jr.)**

138.     Plaintiffs restate and incorporate all of their statements and allegations contained in paragraphs 1 through 76 and 102 through 106, in their entirety, as if fully rewritten herein.

139.     12 C.F.R. § 1024.41(a) explicitly provides that "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. § 2605(f))."

140.     12 C.F.R. § 1024.41(b)(1) defines a "complete loss mitigation application" as "an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower."

141.     12 C.F.R. § 1024.41(c)(2)(iv) defines a "facially complete application" as an application with which "a borrower submits all the missing documents and information as stated in the notice required under paragraph (b)(2)(i)(B) of this section, when no additional information is requested in such notice, or once the servicer is required to provide the borrower a written notice pursuant to paragraph (c)(3)(i) of this section."

142.     12 C.F.R. § 1024.41(b)(2) provides that if a servicer receives a loss mitigation application forty-five (45) days or more before a foreclosure sale that the servicer must promptly review the application to determine whether the application is complete and notify the borrower in writing within five (5) days, excluding public holidays, Saturdays, and Sundays, whether the application is complete.

143.     Comment 1 of the Official CFPB Interpretations to 12 C.F.R. § 1024.41(b)(3) provides that "[i]f no foreclosure sale has been scheduled as of the date that a complete loss

mitigation application is received, the application is considered to have been received more than

90 days before any foreclosure sale."

144.   12 C.F.R. § 1024.41(f)(2) states:

> If a borrower submits a complete loss mitigation application during the pre-foreclosure review period set forth in paragraph (f)(1) of this section or before a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, a servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:
>
> i.   The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;
>
> ii.   The borrower rejects all loss mitigation options offered by the servicer; or
>
> iii.   The borrower fails to perform under an agreement on a loss mitigation option.

145.   Comment 1 of the Official CFPB Interpretations to 12 C.F.R. § 1024.41(f)

provides that:

> Section 1024.41(f) prohibits a servicer from making the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process under certain circumstances. Whether a document is considered the first notice or filing is determined on the basis of foreclosure procedure under the applicable State law.
>
> i.   Where foreclosure procedure requires a court action or proceeding, a document is considered the first notice or filing if it is the earliest document required to be filed with a court or other judicial body to commence the action or proceeding (e.g., a complaint, petition, order to docket, or notice of hearing).

146.    According to Wells Fargo's April 7, 2014 letter, Wells Fargo did not request additional or corrective information or documents and therefore Wells Fargo received all the information that it required to review William Liguori, Jr.'s eligibility for mortgage payment assistance options - making his application a complete loss mitigation application pursuant to 12 C.F.R. § 1024.41(b)(1) or at the very least a facially complete application pursuant to 12 C.F.R. § 1024.41(c)(2)(iv). *See Exhibit 4*.

147.    On April 9, 2014, Wells Fargo filed the Liguori Foreclosure, even though Wells Fargo did not send William Liguori, Jr. any written notice pursuant to 12 C.F.R. § 1024.41(c)(1)(ii) stating that he is not eligible for any loss mitigation option until April 14, 2014. *See Exhibit 5*.

148.    The Apology Letter to the Liguoris proves that Wells Fargo did not truthfully inform William Liguori, Jr. of his eligibility for a HAMP modification until over four years after the Liguori Foreclosure was filed. *See Exhibit 2*.

149.    Wells Fargo's actions, in filing the Liguori Foreclosure while failing to notify William Liguori, Jr. that he was eligible for a HAMP modification, constitutes a clear, separate, and distinct violation of 12 CFR § 1024.41(f).

150.    Wells Fargo's actions directly, foreseeably, and proximately caused William Liguori, Jr.'s damages, as discussed, *supra*, at ¶ 101.

151.    Wells Fargo's actions are part of a pattern and practice of behavior in conscious disregard for William Liguori, Jr.'s rights.

152.    As a result of Wells Fargo's actions, Wells Fago is liable to William Liguori, Jr. for actual damages and statutory damages, 12 U.S.C. § 2605(f)(1).

153.     Additionally, William Liguori, Jr. requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

<u>COUNT THREE</u>

**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**

**(On behalf of all Plaintiffs and the Class)**

154.     Plaintiffs restate and incorporate all of their statements and allegations contained in paragraphs 1 through 120, in their entirety, as if fully rewritten herein.

155.     Aguilar is a "person" within the meaning of GBL § 349(h).

156.     Manley is a "person" within the meaning of GBL § 349(h).

157.     William Liguori, Jr. is a "person" within the meaning of GBL § 349(h).

158.     Tricia Liguori is a "person" within the meaning of GBL § 349(h).

159.     GBL § 349(a) makes unlawful deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in New York State.

160.     Wells Fargo's conduct, as discussed, *supra*, consisted of deceptive acts and practices in the form of misrepresenting to Plaintiffs that they did not qualify for a trial modification and continuing with foreclosure proceedings.

161.     Wells Fargo admits that but for its error, Plaintiffs "would have been approved for a trial modification." *See Exhibits 1 and 2*.

162.     Although Wells Fargo describes the problem as a "faulty calculation," Wells Fargo's failure to disclose the existence of the error, for nearly three years after it purportedly corrected the error, indicates that this error was more than a simple mistake.

163.     Wells Fargo admits the automated calculation errors began on April 23, 2010, yet the error was still affecting consumers years later during the time of Plaintiffs' loan modification

reviews. Wells Fargo's failure to fix the automated calculation errors during this period constitute deceptive acts and practices in violation of GBL § 349(a).

164.    Wells Fargo's conduct is deceptive and misleading in a material way, as Wells Fargo's use of its flawed software led Plaintiffs to believe that they were not eligible for trial modifications and improperly denied Plaintiffs for trial modifications. If Wells Fargo's software provided accurate information, Plaintiffs would have accepted loan modifications and avoided losing their homes through foreclosure.

165.    Wells Fargo's conduct is part of a pattern directed at consumers generally, as there were errors in Wells Fargo's automated software used to determine whether or not Plaintiffs and the other borrowers qualified for loan modifications. Wells Fargo wrongfully denied hundreds of borrowers for years until it corrected the issue.

166.    Wells Fargo intended that Plaintiffs and the Class members to rely on the misrepresentations in order to continue with the foreclosure cases and avoid potential legal claims.

167.    Plaintiffs and the Class members reasonably relied on the misrepresentations because there was no possible way to discover that they were wrongfully denied until Wells Fargo informed them years later of the automated calculation errors.

168.    Wells Fargo's deceptive and misleading acts or practices directly, foreseeably, and proximately caused Plaintiffs' damages, as discussed, *supra*, at ¶¶ 88 and 101.

169.    Wells Fargo's deceptive and misleading acts or practices directly, foreseeably, and proximated caused damages to the Class which include, but are not limited to based on the allegations of the Plaintiffs, the loss of their homes, including the loss of requity, lost

appreciation of the homes as an asset, and the loss of time and money invested in their homes; payment of fees and penalties; loss of tax benefits, favorable interest rates, or other favorable loan terms; loss of time and money spent in an effort to avoid foreclosure; damage to their credit including increased borrowing costs; moving expenses and the loss of time required to locate new housing and relocation; and housing costs.

170.    As a result of Wells Fargo's conduct, Wells Fargo is liable for actual damages described and statutory damages of fifty dollars to each Plaintiff and Class Member. GBL § 349(h).

171.    Plaintiffs and Class Members request reasonable attorneys' fees and costs when they prevail at trial. GBL § 349(h).

## COUNT FOUR
## VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (On behalf of Jose Aguilar, Elizabeth Manley, and William Liguori, Jr. and the Class)

172.    Plaintiffs restate and incorporate all of their statements and allegations contained in paragraphs 1 through 120 and 169, in their entirety, as if fully rewritten herein.

173.    Wells Fargo was in privity of contract with Aguilar, Manley, and William Liguori, Jr., through their respective loans, and as such was obligated by contract and common law to act in good faith and to deal fairly with Aguilar, Manley, and William Liguori, Jr.

174.    The purpose of the covenant of good faith and fair dealing is to guarantee that the parties remain committed to the intended and agreed upon expectations of the parties in their performance.

175.     Wells Fargo has breached this duty by delaying the loss mitigation process, ultimately denying Aguilar, Manley, and William Liguori, Jr. the benefit of a loan modification based on automated calculation errors and continuing the foreclosure process.

176.     Wells Fargo has acted in bad faith, dishonestly, and with an improper motive to injure the rights of Aguilar, Manley, and William Liguori, Jr.

177.     Aguilar, Manley, and William Liguori, Jr. suffered actual damages that were caused by Wells Fargo's conduct, as discussed, *supra*, at ¶¶ 88 and 101.

178.     The Class members suffered actual damages caused by Wells Fargo's conduct, as discussed, *supra*, at ¶ 169.

<u>**COUNT FIVE**</u>
**COMMON LAW FRAUD**

**(On behalf of all Plaintiffs and the Class)**

179.     Plaintiffs restate and incorporate all of their statements and allegations contained in paragraphs 1 through 120 and 169, in their entirety, as if fully rewritten herein.

180.     Wells Fargo made material misrepresentations of a presently existing or past fact when it misrepresented to Plaintiffs that they did not qualify for trial modifications.

181.     Wells Fargo was aware of the automated calculation errors since at least October 20, 2015, or likely earlier, yet continued to conceal this error from Plaintiffs until discreetly disclosing this information in its August 3, 2018 10-Q.

182.     Although Wells Fargo describes the problem as a "faulty calculation," Wells Fargo's failure to disclose the existence of the error, for nearly three years after it purportedly corrected the error, indicates that this error was more than a simple mistake.

183.   Wells Fargo continues to conceal the details surrounding the automated calculation errors and refuses to provide Plaintiffs with more information relating to how Wells Fargo discovered and corrected the error.

184.   Wells Fargo knew or should have known that the misrepresentations were false, as inferred by its unexplainable conduct in failing to notify Plaintiffs, and other borrowers who lost their homes, of the automated calculation errors for nearly three years after the errors were purportedly corrected.

185.   Wells Fargo intended that Plaintiffs and Class members rely on the misrepresentations in order to continue with the foreclosure cases and avoid potential legal claims.

186.   Plaintiffs and Class members reasonably relied on the misrepresentations because there was no possible way to discover that they were wrongfully denied until Wells Fargo informed them years later of the automated calculation errors.

187.   Plaintiffs suffered actual damages that were caused by Wells Fargo's conduct, as discussed, *supra*, at ¶¶ 88 and 101.

188.   The Class members suffered actual damages caused by Wells Fargo's conduct, as discussed, *supra*, at ¶ 169.

189.   As Wells Fargo's conduct was willfully and wantonly reckless or malicious, Plaintiffs and Class Members are entitled to punitive damages.

**COUNT SIX**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(On behalf of all Plaintiffs and the Class)**

190.     Plaintiffs restate and incorporate all of their statements and allegations contained in paragraphs 1 through 120 and 169, in their entirety, as if fully rewritten herein.

191.     Wells Fargo engaged in extreme and outrageous conduct as alleged herein. Wells Fargo repeatedly failed to properly verify or audit mortgage modification software on which its customers' homes and wellbeing depended. It allowed systematic errors to persist for five to eight years; ignored consent decrees requiring it to reform its mortgage modification and foreclosure practices; failed to reform its verification and auditing practices even after the government found a software error had led Wells Fargo to wrongfully deny mortgage modifications; concealed its discovery of an additional software error from regulators and customers; and failed to identify other related errors for an additional three years.

192.     The same extreme and outrageous conduct that caused a series of scandals and consumer abuses within Wells Fargo—leading the government to impose billions of dollars in fines and to forbid Wells Fargo from growing until reforms were implemented—was also responsible for Plaintiffs and Class members losing their homes here. Wells Fargo's board and executive leadership abandoned their oversight responsibilities to a shocking degree, repeatedly ignoring compliance failures, government fines, and consent decrees requiring leadership to implement appropriate auditing and compliance procedures.

193.     With regard to Wells Fargo's mortgage modification and foreclosure processes in particular, Wells Fargo's Board and executive leadership repeatedly failed to ensure Wells Fargo conducted the necessary testing and audits to detect and promptly remedy any violations of

HAMP or other government requirements. Wells Fargo's leadership ignored its oversight responsibilities even after the government found it had not adequately overseen Wells Fargo's mortgage modification and foreclosure operations, even after it agreed to implement proper oversight as part of two 2011 consent orders, and even after the government found in 2015 that Wells Fargo had continuously failed to comply with the consent. Leadership so flagrantly and repeatedly disregarded its oversight responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it will be prohibited from growing unless and until it reforms its oversight and governance.

194.    Wells Fargo acted with reckless disregard for the probability that its conduct would cause emotional distress to Plaintiffs who were wrongfully denied mortgage modifications and foreclosed upon.

195.    As a direct and proximate result of Wells Fargo's conduct, Plaintiffs have suffered both monetary losses and emotional distress as plead, *supra*, at ¶¶ 88 and 101.

196.    As a direct and proximate result of Wells Fargo's conduct, the Class members suffered monetary losses and emotional distress discussed, *supra*, at ¶ 169.

197.    Both the emotional distress suffered by the Plaintiffs and the Class was severe that no reasonable person could be expected to endure it.

198.    At least one Federal Court has found that the actions of Wells Fargo plausibly state a claim for intentional infliction of emotional distress under California law which has substantially similar elements as the claims being brought by these Plaintiffs. See *Hernandez, et al. v. Wells Fargo Bank, N.A.*, Case No. 18-cv-07354-WHA, (CD Cal.) Dkt. No. 87, June 3, 2019 Order on Motion to Dismiss at p. 11 ("The complaint alleges that Wells Fargo repeatedly

failed to test the automated decision-making tool it used to determine borrowers' eligibility for mortgage modifications, even in the face of a consent decree which put Wells Fargo on notice that it needed to implement such testing. Moreover, as alleged in the complaint, Wells Fargo went so far as to conceal its discovery of systemic errors from regulators and borrowers for several years. Plaintiffs allege that Wells Fargo knowingly and repeatedly refused to address these problems, deliberately deciding to put profits and growth over compliance. As a result, plaintiffs (and hundreds of other borrowers) lost their homes and suffered severe emotional distress. Wells Fargo was happy to receive HAMP money but when it came time to actually deliver on loan modifications, it systematically turned homeowners out into the streets through an alleged pattern of reckless and heartless "errors" and "cover-ups." This order cannot say as a matter of law that Wells Fargo's conduct, as currently pled, could not be deemed outrageous. That issue will need to be considered after the facts are developed in discovery."); *see also Symonds v. Mercury Sav. & Loan Ass'n,* 225 Cal. App. 3d 1458 (1990).

199.    The damage to Plaintiffs and the Class was foreseeable because Wells Fargo knew Plaintiffs would lose their homes after Wells Fargo improperly denied Plaintiffs for loan modifications. Wells Fargo was simultaneously pursuing a foreclosure and reviewing Plaintiffs' eligibility for loan modifications.

200.    As Wells Fargo's conduct was willfully and wantonly reckless or malicious, Plaintiffs and the Class are entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Jose Aguilar, Elizabeth Manley, William Liguori, Jr., and Tricia Liguori, individually and on behalf of all others similarly situated in the Class pray that

this Court enter its order granting judgment against Defendant Wells Fargo Bank, N.A. for the following:

A.   Actual damages in excess of $75,000.00 in an amount to be determined at trial as to Counts One through Six;

B.   Statutory damages as to Counts One through Three;

C.   Treble damages as to Count Three;

D.   Punitive damages as to Count Five and Six;

E.   Costs and reasonable attorneys' fees as to Counts One through Three; and

F.   Such other relief as this Court deems appropriate.

Respectfully submitted,

_____
Javier L. Merino
Marc E. Dann (pro hac vice anticipated)
Dann Law
372 Kinderkamack Road, Suite 5
Westwood, NJ 07675
Phone: (216) 373-0539
Fax: (216) 373-0536
notices@dannlaw.com

## JURY DEMAND

Plaintiffs hereby request a trial by jury on all issues, with the maximum number of jurors permitted by law.

Javier L. Merino
Dann Law